[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Bethel*, Slip Opinion No. 2022-Ohio-783.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-783

THE STATE OF OHIO, APPELLEE, *v*. BETHEL, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Bethel*, Slip Opinion No. 2022-Ohio-783.]**

*Criminal law—Successive postconviction motion—Suppression of evidence—R.C. 2953.23(A)(1)(b)—Defendant seeking to assert a claim under* Brady v. Maryland *is not required to show that he could not have discovered suppressed evidence by exercising reasonable diligence—Defendant must establish that allegedly suppressed evidence is material—Motion for new trial—Until a trial court grants leave to file a motion for a new trial, motion for a new trial is not properly before the court—Crim.R. 33 prescribes the circumstances under which a defendant may seek leave to file a motion for a new trial alleging that he was unavoidably prevented from discovering evidence but does not give a deadline by which leave must be sought—Trial court does not have discretion to deny leave to file a motion for a new trial based on failure to seek leave within a reasonable time after discovering new evidence.*

(No. 2020-0648—Submitted September 8, 2021—Decided March 22, 2022.)

APPEAL from the Court of Appeals for Franklin County,

No. 19AP-324, 2020-Ohio-1343.

_____

**FISCHER, J.**

## I. INTRODUCTION

{¶ 1} In 2003, appellant, Robert W. Bethel, was sentenced to death after being convicted of the aggravated murders of James Reynolds and Shannon Hawk, who were shot to death in a secluded field in Columbus in 1996. Evidence showed that Bethel and another man, Jeremy Chavis, had killed Reynolds to prevent him from testifying in the murder trial of one of their friends. Hawk was Reynolds's girlfriend and happened to be with him at the time.

{¶ 2} In 2018, Bethel filed a motion for leave to file a motion for a new trial under Crim.R. 33(B), claiming that in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution had suppressed an investigation report that was created in 2001. In a second filing, Bethel both moved for a new trial and submitted a successive petition for postconviction relief under R.C. 2953.23. In both filings, Bethel argued that the investigation report showed that Chavis had committed the murders with Chavis's cousin, Donald Langbein.

{¶ 3} The trial court denied Bethel's motion for leave and the motion for a new trial and found that it lacked jurisdiction to consider his successive postconviction petition. The Tenth District Court of Appeals affirmed. We accepted jurisdiction over Bethel's discretionary appeal and now affirm.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Trial and direct appeal

{¶ 4} In 1995, Reynolds saw Tyrone Green shoot someone to death during a burglary. The shooting led to Green's indictment for aggravated murder with death

specifications. During discovery, Green learned that Reynolds had been identified as a potential witness against him.

{¶ 5} Green was a member of a street gang, along with Bethel, Chavis, and Langbein. Langbein testified at Bethel's trial that he and Bethel had been concerned about witnesses testifying against Green and had discussed "tak[ing] steps to get rid of them." After Reynolds was killed, Green pleaded guilty to a reduced charge of manslaughter.

{¶ 6} The main evidence tying Bethel to the murders of Reynolds and Hawk came from three sources. The most significant evidence was a confession Bethel had proffered as part of a plea deal to avoid the death penalty. In the proffer, Bethel admitted that he and Chavis had lured Reynolds and Hawk to the secluded field to kill them. He said that he used a 9 mm firearm and that Chavis used a shotgun. The plea deal was contingent on Bethel's willingness to testify against Chavis, and when Bethel later refused to do so, the deal was voided and his confession was used against him. Bethel testified at his own trial and denied killing Reynolds and Hawk. He claimed that he and Chavis were at Bethel's mother's house when Reynolds and Hawk were believed to have been killed.

{¶ 7} Next, Langbein gave testimony that was consistent with Bethel's proffered confession. When he was facing unrelated charges in 2000, Langbein told police and Bureau of Alcohol, Tobacco, and Firearms ("ATF") agents that he had information about the Reynolds and Hawk murders. At Bethel's trial, Langbein testified that on the evening of the murders, he saw Reynolds and Hawk riding with Bethel and Chavis in Bethel's car. And he testified that a couple of weeks after the murders, Bethel told him that he had shot Reynolds and Hawk multiple times with a 9 mm handgun and that Chavis had used a shotgun. Those details were consistent with the autopsies; Hawk had four bullet wounds and Reynolds had nine bullet wounds and one wound caused by a shotgun slug fired into his back.

**{¶ 8}** And finally, Bethel's former girlfriend, Theresa Campbell, testified that sometime after the murders, Bethel told her that he had shot Reynolds and Hawk. She testified that Bethel told her that Chavis was with him at the time of the murders but that Chavis started to cry and went to the car after he saw what Bethel had done.

**{¶ 9}** After finding Bethel guilty of two counts of aggravated murder with death specifications, a jury recommended the death penalty for each count, which the trial court imposed. We affirmed the convictions and death sentences on direct appeal. *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150.

### B. Postconviction proceedings

*1. Bethel's first postconviction petition*

**{¶ 10}** Bethel filed a timely petition for postconviction relief under R.C. 2953.21 in February 2005. The trial court dismissed the petition, and the court of appeals affirmed. *State v. Bethel*, 10th Dist. No. 07AP-810, 2008-Ohio-2697, ¶ 67. We did not accept jurisdiction over Bethel's discretionary appeal. 122 Ohio St.3d 1502, 2009-Ohio-4233, 912 N.E.2d 107.

*2. Bethel's first motion for leave to file a motion for a new trial*

**{¶ 11}** In 2009, Bethel filed a motion for leave to file a motion for a new trial, along with the new-trial motion itself. He alleged that the state had violated *Brady* by suppressing an investigation report created in 2000 containing information that an ATF agent had received about Langbein. Bethel alleged that he obtained a copy of the report in 2008 through a public-records request to the Columbus Police Department.

**{¶ 12}** According to the report, an inmate at the Franklin County jail, Shannon Williams, said that Langbein (who had been in the jail) told him that he had been "involved in a homicide with an individual who is now incarcerated at the Federal Penn., Ashland, KY, where the victim was shot seventeen times. Williams added that Langbein said that the other individual who was arrested was the driver following the homicide." Bethel argued that Chavis was incarcerated in a federal

prison in Kentucky in 2000, so Langbein's statement to Williams amounted to a confession that Langbein—not Bethel—had committed the murders with Chavis.

{¶ 13} The trial court denied Bethel's motions, and the court of appeals affirmed. *State v. Bethel*, 10th Dist. No. 09AP-924, 2010-Ohio-3837. The court of appeals noted, among other things, that it was "speculative as to whether Langbein's statements [were] referring to the homicides at issue" because he referred to only one victim and Reynolds and Hawks were not shot 17 times, either individually or collectively. *Id*. at ¶ 21. We did not accept jurisdiction over Bethel's discretionary appeal. 132 Ohio St.3d 1513, 2012-Ohio-4021, 974 N.E.3d 112.

*3. Bethel's second motion for leave to file a motion for a new trial and successive postconviction petition*

{¶ 14} In 2018, Bethel filed a second motion for leave to file a motion for a new trial along with a combined new-trial motion and successive postconviction petition. Bethel argued that the state had suppressed another investigation report— called "Summary 86"—that he said also implicated Langbein in the murders of Reynolds and Hawk. Summary 86 recounts a 2001 interview of Ronald Withers, who was incarcerated in the Franklin County jail at the time. Withers told investigators that while they were both in the jail, Chavis told him that he had been involved in a murder but that "when [Chavis] shot the individual [the victim] was already dead." Summary 86 states that "Chavis told Withers that his cousin was the other shooter, and his cousin is also incarcerated."

{¶ 15} The trial court found that it lacked jurisdiction over Bethel's successive postconviction petition and denied Bethel's motion for leave and motion for a new trial. The court of appeals affirmed. We accepted jurisdiction over Bethel's appeal. 159 Ohio St.3d 1487, 2020-Ohio-4232, 151 N.E.3d 633. Amicus curiae, the Innocence Network, has filed a merit brief urging this court to reverse the judgment of the court of appeals.

5

### III. ANALYSIS

### A. Res judicata

**{¶ 16}** The state argues that we need not address Bethel's propositions of law because his *Brady* claim is res judicata. The state contends that Bethel received Summary 86 in 2008 when the Columbus Police Department produced more than 1,200 pages of public records—and that Bethel therefore could have brought this *Brady* claim in 2009 when he pursued his other *Brady* claim based on Shannon Williams's allegedly suppressed jailhouse statement. Bethel has not specified when he discovered Summary 86, but his counsel leaves open the possibility that it was produced in 2008.

**{¶ 17}** Res judicata generally bars a convicted defendant from litigating a postconviction claim that was raised or could have been raised at trial or on direct appeal. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus. The state does not argue that Bethel could have raised this *Brady* claim at trial or on direct appeal, but it relies on several cases in which Ohio courts of appeals applied res judicata to prevent a convicted defendant from raising postconviction issues in a piecemeal fashion. *See, e.g.*, *State v. Bene*, 11th Dist. Lake Nos. 2019-L-070, 2019-L-071, and 2019-L-072, 2020-Ohio-1560, ¶ 13-14.

**{¶ 18}** The state, in raising the doctrine of res judicata, has the burden of showing that Bethel could have asserted this *Brady* claim in 2009. *See In re Application of Ohio Power Co.*, 144 Ohio St.3d 1, 2015-Ohio-2056, 40 N.E.3d 1060, ¶ 22. The state asserts only that it is "very likely" that Bethel received Summary 86 in 2008. And it argues that Bethel has not *disproved* that he could have presented this *Brady* claim in 2009. But Bethel is not required to make that showing. We hold that the state has not met its burden to show that res judicata bars Bethel's claim.

### B. The *Brady* standard

**{¶ 19}** In *Brady*, the Supreme Court of the United States held that a state violates the Fourteenth Amendment to the United States Constitution when it

"withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75, 132 S.Ct. 627, 181 L.Ed.2d 571 (2012) (summarizing *Brady*'s holding). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A different result is reasonably probable "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.* at 434, quoting *Bagley* at 678.

### C. The successive postconviction petition

#### 1. Legal standard and standard of review

{¶ 20} Bethel's petition for postconviction relief was successive and untimely under R.C. 2953.21(A). Therefore, given the substance of Bethel's allegations, for the trial court to have subject-matter jurisdiction to consider the petition, Bethel had to show (1) that he was "unavoidably prevented from discovery of the facts" upon which his claim relies and (2) by clear and convincing evidence, that no reasonable fact-finder would have found him guilty or eligible for the death sentence but for the constitutional error at trial. R.C. 2953.23(A)(1). *See State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 36. We review de novo whether the trial court had subject-matter jurisdiction to entertain Bethel's petition. *Apanovitch* at ¶ 24.

### 2. *"[U]navoidably prevented from discovery of the facts"*
### ***a. Reasonable diligence***

**{¶ 21}** For the trial court to have jurisdiction to entertain the *Brady* claim alleged in the successive postconviction petition, Bethel first had to establish that he was "unavoidably prevented from discovery of the facts" on which he relies. R.C. 2953.23(A)(1)(a). To meet this standard, courts in Ohio have previously held that a defendant ordinarily must show that he was unaware of the evidence he is relying on and that he could not have discovered the evidence by exercising reasonable diligence. *See State v. Harrison*, 8th Dist. Cuyahoga No. 105909, 2018-Ohio-1396, ¶ 6.

**{¶ 22}** In concluding that Bethel did not meet his burden, the trial court found that Bethel had ample reason and opportunity to discover what Withers might have known and what Chavis might have said about the murders. The trial court first noted that there was no evidence that Withers or his attorney communicated or did not communicate with Bethel's legal team about what Chavis had said. However, based on the fact that the state had disclosed Withers as a potential witness at trial, the trial court concluded that the state had "invited Bethel's counsel to interview Withers." The court further found that Bethel and his legal team knew that Chavis would have information relevant to Bethel's case and that they "were not unavoidably prevented from discovering what [Chavis] might say." In sum, the trial court found that Bethel was not unavoidably prevented from discovering the substance of Summary 86, because his attorneys could have uncovered the information by talking to Withers or Chavis.

**{¶ 23}** The court of appeals used similar reasoning, holding that a "defendant cannot claim evidence was undiscoverable simply because no one made efforts to obtain the evidence sooner." 2020-Ohio-1343, ¶ 20. The court stated that "Bethel was not prevented by the state from discovering Chavis' statements to Withers." *Id.* at ¶ 25. It reasoned that Bethel should have suspected that Withers had potentially

relevant information because Withers's name was on the prosecution's pretrial witness list and Bethel and his counsel had communicated with Chavis before trial. *Id.* The court of appeals concluded, in other words, that Bethel should have conducted his own investigation to discover what Chavis had said to Withers.

{¶ 24} The lower courts placed a burden on Bethel that is inconsistent with *Brady*. In *Banks v. Dretke*, 540 U.S. 668, 695, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), the Supreme Court of the United States explained that criminal defendants have no duty to "scavenge for hints of undisclosed *Brady* material." Since the decision in *Banks*, multiple federal circuit courts and other state supreme courts have repudiated the imposition of any due-diligence requirement on defendants in *Brady* cases. *See, e.g.*, *Dennis v. Secy., Pennsylvania Dept. of Corr.*, 834 F.3d 263, 290-293 (3d Cir.2016); *Amado v. Gonzalez*, 758 F.3d 1119, 1136-1137 (9th Cir.2014); *United States v. Tavera*, 719 F.3d 705, 711-712 (6th Cir.2013); *State v. Wayerski*, 2019 WI 11, 385 Wis.2d 344, 922 N.W.2d 468, ¶ 51; *People v. Bueno*, 218 CO 4, 409 P.3d 320, ¶ 39; *State v. Reinert*, 2018 MT 111, 391 Mont. 263, 419 P.3d 662, ¶ 17, fn. 1; *People v. Chenault*, 495 Mich. 142, 152, 845 N.W.2d 731 (2014).

{¶ 25} It is well settled that a defendant is entitled to rely on the prosecution's duty to produce evidence that is favorable to the defense. *See Kyles*, 514 U.S. at 432-433, 115 S.Ct. 1555, 131 L.Ed.2d 490. A defendant seeking to assert a *Brady* claim therefore is not required to show that he could not have discovered suppressed evidence by exercising reasonable diligence. *See Strickler*, 527 U.S. at 282-285, 119 S.Ct. 1936, 144 L.Ed.2d 286. We hold that when a defendant seeks to assert a *Brady* claim in an untimely or successive petition for postconviction relief, the defendant satisfies the "unavoidably prevented" requirement contained in R.C. 2953.23(A)(1)(a) by establishing that the prosecution suppressed the evidence on which the defendant relies.

### b. Satisfying Brady's second prong

{¶ 26} Although the state concedes that the holding just stated is correct, it also argues that Bethel failed to satisfy *Brady*'s second prong (i.e., suppression by the state), because he has not shown that he did not know about the evidence contained in Summary 86 at the time of his trial. The state cites *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), in which the court stated that *Brady* claims involve the discovery of information that "had been known to the prosecution *but unknown to the defense*." (Emphasis added.) The state contends that Bethel's claim fails because he "failed to provide evidentiary documentation indicating [his] actual unawareness" of the evidence he is relying on.

{¶ 27} The state exaggerates Bethel's burden. Two of Bethel's former attorneys provided affidavits stating that Bethel and his legal team did not know about Summary 86 before Bethel's trial. The state provides no support for its claim that these affidavits were insufficient or that Bethel needed additional evidence to prove that he was unaware of the report before trial.

{¶ 28} The state's argument also is problematic because it misconstrues the evidence at issue. The state argues that Bethel himself necessarily knew the extent of Langbein's involvement, because Bethel's own alibi placed Bethel with Chavis at the time of the murders and the information from Shannon Williams would have made Bethel the getaway driver. But Bethel's knowledge of Langbein's involvement is not the question; the question is whether Bethel knew about Withers's statement concerning what Chavis allegedly had said while in jail.

{¶ 29} In sum, the state argues that the prosecution did not suppress the Withers information, because Bethel "could have learned of the information through other means." The state contends that the "defense knew *something*, and the defense was not limited to being a passive receptor of whatever discovery was provided by the prosecution." (Emphasis sic.) This is the state's reasonable-diligence

requirement dressed in different clothing. We reject the state's arguments for the reasons discussed above.

**{¶ 30}** We conclude that the documents Bethel submitted with his successive postconviction petition establish a prima facie claim that the prosecution suppressed Summary 86.

### *3. No reasonable fact-finder would have found him guilty or eligible for the death sentence but for the constitutional error at trial*

**{¶ 31}** Bethel's postconviction petition faces an additional jurisdictional hurdle: under R.C. 2953.23(A)(1)(b), he must show by clear and convincing evidence that no reasonable fact-finder would have found him guilty or eligible for the death sentence but for constitutional error at trial. This question goes to the heart of *Brady*'s third prong, which requires Bethel to show that " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles*, 514 U.S. at 433, 115 S.Ct. 1555, 131 L.Ed.2d 490, quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375, 87 L.Ed.2d 481.

**{¶ 32}** The *Brady* standard does not require Bethel to show that disclosure of the Withers information would have resulted in his acquittal. *See Kyles* at 434. Nor does it require him to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been [sufficient evidence] left to convict," *id*. at 434-435. Rather, Bethel must prove that "in the context of the entire record," *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392, 49 L.Ed.2d 342, suppression of the Withers information " 'undermines confidence in the outcome of the trial,' " *Kyles* at 434, quoting *Bagley* at 678.

**{¶ 33}** The trial court found that Bethel was not prejudiced by his lack of access to the Withers information prior to trial. The court characterized Summary 86 as a "cryptic double hearsay statement" that Bethel could not have used directly at trial under the Rules of Evidence. The court concluded that "Summary 86 would not have changed anything," because Bethel had confessed to killing Reynolds and

Hawk. The court of appeals agreed that the Withers information is immaterial for *Brady* purposes. 2020-Ohio-1343 at ¶ 26-28. That court suggested that the theory Summary 86 supports—that Chavis and Langbein murdered Reynolds and Hawk—is untenable in view of Bethel's own inconsistent statements (a confession and an alibi), both of which placed Bethel with Chavis at the time of the murders. *Id*. at ¶ 27.

{¶ 34} Suppressed evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555, 131 L.Ed.2d 490. And the materiality of suppressed evidence must be viewed "in the context of the entire record." *Agurs* at 112. Therefore, in examining the materiality of the Withers information, we also must consider the pretrial statement that Shannon Williams made to investigators, which the prosecution also allegedly suppressed. The question is whether we can have confidence in the jury's verdict even assuming that the prosecution suppressed the information Williams and Withers had provided to investigators. *See Kyles* at 434. To answer that question, we must examine how Bethel might have benefited from that information at trial.

{¶ 35} To start, Bethel could not have used the Withers information as direct evidence that Langbein (and not Bethel) murdered Reynolds and Hawk. The statements in Summary 86, which report what Withers had said to investigators, are double hearsay. And although Withers affirmed his statements in an affidavit and could have testified at trial, the statements are still hearsay because Withers merely repeated what Chavis had allegedly told him. Bethel argues that the Withers information would have undermined the state's case against him, but he does not identify any hearsay exception that would have allowed Chavis's purported statements to Withers to be introduced for the truth of the matter asserted. *See* Evid.R. 801, 803, 804. And Summary 86 could not have been used to impeach Langbein, because it does not involve a prior statement made by Langbein.

{¶ 36} Bethel nevertheless argues that he could have used the Withers information in his cross-examination of one of the investigators to attack the thoroughness of the investigation. But Bethel has not shown that such questioning would have " 'seriously undermine[d],' " *Eakes v. Sexton*, 592 Fed.Appx. 422, 427-428 (6th Cir.2014), quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir.1989), any investigator's credibility in view of the strong evidence that corroborated the conclusion reached during the investigation that the evidence—most significantly, Bethel's confession—showed that Bethel had committed the murders.

{¶ 37} Nor has Bethel shown that the information from Williams would have bolstered the significance of the Withers information or detracted from the clear evidence of Bethel's guilt. Even if Bethel had called Williams to testify in an effort to impeach Langbein, Williams would not have said that Langbein had confessed to killing Reynolds and Hawk. It was not clear in the report relaying Williams's statement that Langbein was talking to Williams about the murders of Reynolds and Hawk. Bethel's confession, in contrast, included details about the types of firearms that were used, which were consistent with the autopsies of Reynolds and Hawk. And Bethel did not talk only to Langbein and investigators about the fact that he had killed Reynolds and Hawk; he also confessed to Campbell.

{¶ 38} Bethel argues that if he had possessed the information from Withers and Williams before his trial, he would not have proffered the confession. He contends that he falsely confessed to murdering Reynolds and Hawk to avoid the death penalty only because he had no viable defense on the eve of trial. This argument invites us to stray from the main question of *Brady*'s third prong—i.e., whether Bethel received a fair trial. *See Agurs*, 427 U.S. at 108, 96 S.Ct. 2392, 49 L.Ed.2d 342. Bethel is not arguing here that the Withers and Williams information would have been useful to his defense. Instead, he is arguing that his ignorance of

the information induced him to lie about committing the murders. This tenuous theory does not support Bethel's claim that he did not receive a fair trial.

{¶ 39} Finally, Bethel argues that we must separately analyze whether the suppression of the Withers and Williams information undermines the decision sentencing him to death. Such an inquiry is appropriate. *See* R.C. 2953.23(A)(1)(b) (requiring a petitioner to show that no reasonable fact-finder would have found him guilty at trial *or* eligible for the death sentence but for constitutional error at the sentencing hearing). But Bethel fails to demonstrate how he could have used the Withers and Williams information during the sentencing phase of his trial. To the extent that he is arguing that the information would have created residual doubt about his guilt, that purpose would not have been proper under Ohio law. *See State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus.

{¶ 40} At bottom, the Withers and Williams information has limited probative value in the context of the entire record, and Bethel's opportunities to use that information would have been limited. Bethel, again, was convicted on the weight of his own proffered confession, Langbein's testimony, and Campbell's testimony. 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 101. We hold that Bethel has not shown by clear and convincing evidence that no reasonable fact-finder would have found him guilty or eligible for the death sentence but for constitutional error at trial. Therefore, the trial court lacked jurisdiction to entertain Bethel's successive postconviction petition.

**D. The motion for a new trial**

{¶ 41} The trial court also denied Bethel's motion for a new trial and then denied his motion for leave to file that motion. That approach was incorrect: until a trial court grants leave to file a motion for a new trial, the motion for a new trial is not properly before the court. *State v. Brown*, 8th Dist. Cuyahoga No. 95253, 2011-Ohio-1080, ¶ 14. The trial court should not have purported to deny Bethel's new-

trial motion on its merits, because the court never permitted Bethel to file that motion. The merits of Bethel's new-trial motion, therefore, is not before us.

**E. The motion for leave to file a motion for a new trial**

*1. R.C. 2953.21(K)*

{¶ 42} R.C. 2953.21 authorizes a convicted person to challenge his conviction or sentence by filing a petition for postconviction relief. R.C. 2953.21(K) provides that except for an appeal, "the remedy set forth in [R.C. 2953.21] is the exclusive remedy by which a person may bring a collateral challenge to the validity of a conviction or sentence in a criminal case." The state argues that a motion for a new trial is a "collateral challenge," so Bethel's motion for leave to file a motion for a new trial is improper and must be treated as a successive postconviction petition—which as just discussed, the trial court lacked jurisdiction to entertain.

{¶ 43} The state argues that the issue is whether a motion for a new trial filed under Crim.R. 33 is a "collateral challenge to the validity of a conviction or sentence in a criminal case," R.C. 2953.21(K). The term "collateral challenge" is not defined by statute, so we must determine what that term meant when the exclusive-remedy provision was enacted. *See State v. Black*, 142 Ohio St.3d 332, 2015-Ohio-513, 30 N.E.3d 918, ¶ 39 ("In the absence of a definition of a word or phrase used in a statute, words are to be given their common, ordinary, and accepted meaning"). The exclusive-remedy provision of R.C. 2953.21 was first enacted in 1995. *See* former R.C. 2953.21(I), Am.Sub.S.B. No. 4, 146 Ohio Laws, Part IV, 7815, 7825.

{¶ 44} *Black's Law Dictionary* 261 (6th Ed.1990) defined a similar term, "collateral attack":

> With respect to a judicial proceeding, an attempt to avoid, defeat, or evade it, or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking it. *May v. Casker*, 188 Okla. 446, 110 P.2d 287, 289. An attack on a

judgment in any manner other than by action or proceeding, whose very purpose is to impeach or overturn the judgment; or, stated affirmatively, a collateral attack on a judgment is an attack made by or in an action or proceeding that has an independent purpose other than impeaching or overturning the judgment. *Travis v. Travis' Estate*, 79 Wyo. 329, 344 P.2d 508, 510.

By comparison, "direct attack" was defined as

an attempt, for sufficient cause, to have it annulled, reversed, vacated, corrected, declared void, or enjoined, in a proceeding instituted for that specific purpose, such as an appeal, writ of error, bill of review, or injunction to restrain its execution; distinguished from a collateral attack, which is an attempt to impeach the validity or binding force of the judgment or decree as a side issue or in a proceeding instituted for some other purpose. *Ernell v. O'Fiel*, Tex.Civ.App., 441 S.W.2d 653, 655. A direct attack on a judicial proceeding is an attempt to void or correct it in some manner provided by law.

*Id.* at 459. These definitions show that a motion for a new trial is not a collateral challenge—a motion for a new trial is an attempt to void or correct the judgment as provided by law under Crim.R. 33. Bethel's motion for leave, which Bethel filed in his criminal case, is not prohibited under R.C. 2953.21(K) and is permitted under Crim.R. 33. *See State v. Bush*, 96 Ohio St.3d 235, 2002-Ohio-3993, 773 N.E.2d 522, ¶ 13 (stating that a motion to withdraw a plea filed under Crim.R. 32.1 is not a collateral challenge, because it is filed in the underlying criminal case and attacks the withdrawal of the plea). The state's arguments to the contrary are not persuasive.

**{¶ 45}** The state first suggests that Bethel's motion constitutes a collateral challenge simply because it was filed many years after his conviction and sentence. The state points to *State v. Frase*, 87 Ohio St.3d 1412, 717 N.E.2d 345 (1999), in which this court referred to a motion for leave to file an untimely motion for a new trial as "a civil, post-conviction matter." And it points to *State v. Cowan*, 8th Dist. Cuyahoga No. 108394, 2020-Ohio-666, ¶ 9, citing *State v. McConnell*, 2d Dist. Montgomery No. 24315, 2011-Ohio-5555, ¶ 18, in which the court described a delayed new-trial motion as a collateral attack. *Frase* was not a decision on the merits analyzing R.C. 2953.21(K); it was a dismissal entry explaining why an appellant had no right to seek to file a delayed appeal. And the use of the word "collateral" to describe the new-trial motion in *Cowan* was similarly unsupported. These lone references, therefore, are unpersuasive.

**{¶ 46}** The state next argues that we should follow *State v. Reynolds*, 79 Ohio St.3d 158, 679 N.E.2d 1131 (1997), in which this court treated a convicted defendant's motion to "Correct or Vacate Sentence" as a postconviction petition. We held that that motion—which was not filed under a specific criminal rule—should have been analyzed as a postconviction petition because it had the characteristics of a request for relief under R.C. 2953.21. *Id*. at 160. The state argues that Bethel's new-trial motion also fits the R.C. 2953.21 mold, so it too should be analyzed as a collateral challenge under the statute. But in *Bush*, 96 Ohio St.3d 235, 2002-Ohio-3993, 773 N.E.2d 522, ¶ 10, we explained that *Reynolds* was unique because it involved an "irregular 'no name' motion[]" in search of an identity. We determined that it was proper to categorize the motion as a postconviction petition in the absence of any other obvious standard for analyzing it. *Id*. at ¶ 10. We thus limited *Reynolds* to its facts. *Id*. at ¶ 10-11.

**{¶ 47}** The state, in turn, argues that *Bush* was wrongly decided. Primarily, the state contends that the different-proceeding/same-proceeding distinction breaks down because a postconviction petition—which clearly is a collateral challenge—

also is filed within an existing criminal case. The state misinterprets the significance of this filing practice. It is well settled that a postconviction petition initiates a separate civil proceeding notwithstanding the use of an existing criminal-case number. *See State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999). *See also* former R.C. 2309.04 (when R.C. 2953.21 was enacted in 1965, a case-initiating pleading was called a "petition"); Am.H.B. 1201, 133 Ohio Laws 3017, 3020 (repealing former R.C. 2309.04 in 1971 following the adoption of the Rules of Civil Procedure).

**{¶ 48}** The state also relies on *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, 818 N.E.2d 1157, ¶ 17, in which we held that an application for reopening an appeal under App.R. 26(B) is "a distinct collateral postconviction process separate from the original appeal." Here again, the state tries to undermine the different-proceeding/same-proceeding distinction by pointing to a collateral challenge that is filed under an existing case number. But the state again overstates the significance of the filing mechanics. *Morgan* involved a special type of postconviction relief (a claim alleging ineffective assistance of appellate counsel) that does not fall under R.C. 2953.21. *Id*. at ¶ 6. *See State v. Murnahan*, 63 Ohio St.3d 60, 584 N.E.2d 1204 (1992). App.R. 26(B) establishes by rule what the statute does not provide. *Morgan* at ¶ 6-9. *Morgan* therefore is consistent with the above analysis: A request for postconviction relief may be filed under an existing case number and yet be a separate proceeding.

**{¶ 49}** Finally, the state argues that we should look to *People v. Wiedemer*, 852 P.2d 424 (Colo.1993), for guidance. But there is no need for us to do so because *Wiedemer* did not involve a motion for leave to file a motion for a new trial and it is clear that under Ohio law, a motion for leave to file a motion for a new trial is not a collateral challenge under R.C. 2953.21(K).

**{¶ 50}** Bethel's motion for leave to file a motion for a new trial is not barred under R.C. 2953.21(K).

*2. The reasonable-time filing requirement*

{¶ 51} Another preliminary issue is whether Bethel waited too long to file his motion for leave. As noted above, Bethel's counsel acknowledges that Bethel may have obtained Summary 86 in 2008. At the latest, Bethel discovered the document in May 2017, when Withers provided him with an affidavit reiterating the statement Withers had made to investigators. This means that there was a delay of at least 16 months—and perhaps much longer—between the discovery of Summary 86 and the filing of the motion for leave.

{¶ 52} The court of appeals held that it was within the trial court's discretion to deny Bethel's motion for leave because this delay was unreasonable. 2020-Ohio-1343 at ¶ 24. In so holding, the court of appeals followed a rule adopted by most other courts of appeals—that under Crim.R. 33(B), a defendant seeking leave to file a motion for a new trial must do so within a reasonable period of time after discovering the new evidence on which he relies. *Id.* at ¶ 19. *See also State v. Thomas*, 2017-Ohio-4403, 93 N.E.3d 227, ¶ 8 (1st Dist.) (collecting cases).

{¶ 53} Crim.R. 33(B) does not give a deadline by which a defendant must seek leave to file a motion for a new trial based on the discovery of new evidence. The rule states only that a defendant must show that he was "unavoidably prevented from the discovery of the evidence upon which he must rely." Courts nevertheless have concluded that a convicted defendant must file a motion for leave within a reasonable period of time after discovering the new evidence, to prevent defendants from deliberately delaying filing the motion "in the hope that witnesses would be unavailable or no longer remember the events clearly, if at all, or that evidence might disappear." *State v. Stansberry,* 8th Dist. Cuyahoga No. 71004, 1997 WL 626063, *3 (Oct. 9, 1997). Bethel offers several reasons why we should reject this rule. He argues that the rule discourages defendants from conducting full investigations before seeking a new trial, ignores the fact that defendants often lack the resources necessary to seek relief promptly after discovering new evidence, and wrongly

assumes that defendants will delay filing a motion simply to gain an evidentiary advantage at a potential new trial.

{¶ 54} We need not weigh the pros and cons of requiring defendants to seek leave to file a delayed motion for a new trial within a reasonable time after discovering new evidence. We instead must examine whether the Rules of Criminal Procedure permit trial courts to impose this additional hurdle on criminal defendants. In doing so, we apply general principles of statutory construction. *See State ex rel. Office of Montgomery Cty. Pub. Defender v. Rosencrans*, 111 Ohio St.3d 338, 2006-Ohio-5793, 856 N.E.2d 250, ¶ 23. Those principles instruct that our role is to apply the language in Crim.R. 33(B) as written "without adding criteria not supported by the text." *State v. Taylor*, 161 Ohio St. 3d 319, 2020-Ohio-3514, 163 N.E.3d 486, ¶ 9.

{¶ 55} Crim.R. 33(B), again, does not establish a timeframe in which a defendant must seek leave to file a motion for a new trial based on the discovery of new evidence. Courts have justified imposing a reasonable-time filing requirement by relying on Crim.R. 1(B) and 57(B). *See, e.g.*, *Thomas* at ¶ 8; *State v. York*, 2d Dist. Greene No. 2000 CA 70, 2001 WL 332019, *3-4 (Apr. 6, 2001). Neither of those rules supports the imposition of a reasonable-time filing requirement.

{¶ 56} Crim.R. 1(B) provides that the Rules of Criminal Procedure "shall be construed and applied to secure the fair, impartial, speedy, and sure administration of justice, simplicity in procedure, and the elimination of unjustifiable expense and delay." Requiring a defendant to seek leave to file a motion for new trial within a reasonable period of time after discovering the new evidence could help to further some of these objectives, most notably the elimination of delay. But that does not mean that Crim.R. 1(B) authorizes a court to narrow a defendant's opportunity to seek a new trial. Crim.R. 1(B) instructs courts to *construe* Crim.R. 33(B)—that is, to explain its meaning. In requiring defendants to seek leave within a reasonable time after discovering new evidence, courts have not construed Crim.R. 33(B); they have

simply added a requirement that makes sense to them. Crim.R. 1(B) does not authorize the creation of a new requirement that has no foundation within Crim.R. 33(B) itself.

{¶ 57} Crim.R. 57(B) also does not support the creation of a reasonable-time filing requirement. Crim.R. 57(B) provides that "[i]f no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules of criminal procedure, and shall look to the rules of civil procedure and to the applicable law if no rule of criminal procedure exists." Crim.R. 33(B), of course, already prescribes the circumstances under which a defendant may seek leave to file a motion for a new trial. Crim.R. 57(B) does not authorize a court to establish a new procedure when a rule of criminal procedure already governs.

{¶ 58} We hold that the court of appeals erred when it held that it was within the trial court's discretion to deny Bethel's motion for leave based on Bethel's failure to file the motion within a reasonable time after discovering Summary 86.

### 3. The new-trial claim

{¶ 59} "The 'unavoidably prevented' requirement in Crim.R. 33(B) mirrors the 'unavoidably prevented' requirement in R.C. 2953.23(A)(1)." *State v. Barnes*, 5th Dist. Muskingum No. CT2017–0092, 2018-Ohio-1585, ¶ 28. As we discussed above, Bethel made a prima facie claim that he was unavoidably prevented from discovering the Withers information. But we also determined above that the Withers information is immaterial for *Brady* purposes. Thus, even assuming arguendo that Bethel would be entitled to a hearing on his motion for a new trial, the hearing would be an exercise in futility, because we have concluded that Bethel's *Brady* claim, which is the basis of his motion, is without merit. Therefore, it is unnecessary to remand Bethel's motion for leave to file a motion for a new trial under Crim.R. 33 to the trial court, because we find that the motion for a new trial would be without merit.

### IV. CONCLUSION

{¶ 60} Because Bethel failed to meet his burden under R.C. 2953.23(A)(1)(b) to establish that the allegedly suppressed evidence is material, the trial court correctly dismissed Bethel's successive postconviction petition for lack of subject-matter jurisdiction. Bethel's failure to meet his burden under R.C. 2953.23(A)(1)(b) requires this court to deny his motion for leave to file a motion for a new trial. We therefore affirm the judgment of the court of appeals.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, DEWINE, and BRUNNER, JJ., concur.

DONNELLY, J., dissents, with an opinion joined by STEWART, J.

_____

**DONNELLY, J., dissenting.**

{¶ 61} While I agree with the majority that appellant Robert W. Bethel's claim pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is not barred by res judicata, that Bethel established a prima facie claim that the prosecution suppressed the 2001 interview statements of Ronald Withers, and that the prosecution's suppression of favorable evidence in itself satisfies the "unavoidably prevented" requirement of both R.C. 2953.23(A)(1)(a) and Crim.R. 33(B), I would not be so quick to conclude that a timely disclosure of the Withers statement would have had no impact on the fairness of Bethel's criminal proceedings. I especially would not give such short shrift to Bethel's argument that he would not have proffered a confession as part of a plea agreement had the state provided timely disclosure of the 2001 Withers statements as well as the 2000 interview statements of Shannon Williams. I would hold that in his 2018 motions for a new trial and for postconviction relief, Bethel established a prima facie claim that the state's suppression of the statements undermined confidence in the outcome of Bethel's proceedings, and I would remand this case to the trial court for an evidentiary hearing to properly examine Bethel's claims.

**{¶ 62}** I disagree with the majority's statement that Bethel's argument regarding his proffered confession "invites us to stray from the main question of *Brady*'s third prong—i.e., whether Bethel received a fair trial." Majority opinion, ¶ 38. This notion seems to presuppose that our only consideration of the suppressed evidence must be in the context of a spontaneous attempt to admit it into evidence at trial. To the contrary, the state's duty to disclose exculpatory information, and the effect of its failure to disclose exculpatory information, extends to pretrial proceedings and trials alike. *See United States v. Nelson*, 979 F.Supp.2d 123, 129 (D.D.C.2013) (most federal courts agree that "a *Brady* violation can justify allowing a defendant to withdraw a guilty plea"); *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 48 (impact on the defense's trial-preparation and strategic decisions are relevant to the prejudice prong of the *Brady* analysis).

**{¶ 63}** The *Brady* rule is supposed to "ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The risk of a miscarriage of justice does not exist only during a trial. *See Brady v. United States*, 397 U.S. 742, 757-758, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (guilty pleas are "no more foolproof than full trials"). To determine whether a *Brady* violation prejudiced the defendant, a court must look at the "totality of the circumstances," including "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case." *Bagley* at 683.

**{¶ 64}** Establishing that prejudice has occurred in the context of pretrial preparations and the strategic decisions of defense counsel is not an easy task, given the "difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken," *id.* at 683, had the *Brady* violation not occurred. It is nonetheless possible to establish prejudice as long as the suppressed evidence "could reasonably be taken to put the whole case in such a different light

as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). This court's decision in *Brown* is the perfect example of prejudice being established based on the impact of matters beyond the trial itself.

{¶ 65} The defendant in *Brown* was found guilty of the aggravated murder of two people and sentenced to death. The materials suppressed by the state in *Brown* were reports from police interviews with two people who both indicated that someone else had confessed to committing the murders. One person heard the confession directly, while the other heard about it secondhand and from rumors. The man named as a shooter was one of the state's main witnesses against the defendant at trial. Although the statements in the reports were hearsay and might not have been admissible at trial, this court held that their suppression prejudiced the defendant. This court noted that "the significance and materiality of the reports are inherent in their content": the reports indicated that someone other than the defendant had committed the murders. *Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, at ¶ 50. This court also noted that the reports could have led defense counsel to call additional witnesses at trial and could have allowed counsel to better cross-examine the state's witness and impeach his credibility by implicating him in the murders. *Id*. at ¶ 46-47. Moreover, the defense had made a strategic decision not to contest the defendant's general involvement in the charged offenses, based on the paucity of evidence disclosed to them prior to trial, but "[h]ad they known that someone else had claimed to have [committed the murders], they may indeed have changed their strategy." *Id*. at ¶ 48.

{¶ 66} Bethel's case bears many similarities to *Brown*. Bethel was convicted of the aggravated murder of James Reynolds and Shannon Hawk and sentenced to death. The materials suppressed by the state were two reports of police interviews with people who indicated that Jeremy Chavis and Donald Langbein had

confessed to murdering Reynolds and Hawk and had implicated each other in their confessions. Langbein was the state's star witness against Bethel at trial.

{¶ 67} The attorneys who represented Bethel when he entered his guilty plea made a strategic decision to advise Bethel to make some monumental concessions in response to the state's plea demands—namely, to enter a guilty plea, proffer a confession, and waive any rights against admission of the confession and guilty plea, thus allowing the state to eventually use the confession and plea in its case-in-chief against Bethel. Members of Bethel's original defense team testified that they told Bethel that he should accept the terms of the state's plea offer if he wanted to save his life—advice that they thought was in his best interest in light of the evidence known at the time.

{¶ 68} In addition to the type of evidence presented in *Brown*, Bethel's 2018 motions included an affidavit from one of the original attorneys who represented Bethel—Ronald Janes—stating that he had advised Bethel to proffer a confession pursuant to the state's plea terms. Janes averred that the reports would have been "game changers" and that if the state had disclosed the two police interviews in a timely manner, he would not have advised Bethel to agree to the state's plea-agreement terms, particularly the requirement that Bethel proffer a confession. He stated, "I cannot stress enough how much I think these reports shed a whole different light on this case."

{¶ 69} If Withers's and Williams's statements had been properly disclosed at the beginning of the proceedings against Bethel, the defense might have been able to establish that Chavis and Langbein confessed to the murders to the exclusion of all others, namely, Bethel, and the state's case would have been significantly weakened. And Janes's affidavit raises the strong possibility that Bethel would not have proffered a confession and would not have waived his right under Evid.R. 410 against the admissibility of the confession and guilty plea and thereby, his right against self-incrimination at trial.

**{¶ 70}** Although the majority dismisses the possibility that Bethel's confession was false as a "tenuous theory," majority opinion at ¶ 38, the record shows otherwise. Throughout these proceedings, Bethel repeatedly stated that he did not want to accept the state's plea offer and that he did so in the end only because he felt immense pressure from his attorneys, as well as his mother, to make a deal with the state to avoid the death penalty. If Janes's claims are true and Bethel's defense team would have advised him *not* to accept the deal offered by the state, Bethel most likely would have rejected the state's plea terms. As a result, Bethel's confession would never have been proffered and would never have been introduced at his trial.

**{¶ 71}** Accordingly, the import of the suppressed evidence in this case is not limited to the hypothetical cross-examination of witnesses at trial, as discussed by the majority; the suppressed evidence might have served to deprive the state of Bethel's confession, a confession that the majority concedes was the most significant evidence of Bethel's guilt at trial. If the state would not have had a confession to use against Bethel at trial but for its suppression of Williams's and Withers's statements, then Bethel would be entitled to a new trial.

**{¶ 72}** A trial court should hold an evidentiary hearing when a petitioner alleges facts that are materially disputed and that, if proved, would entitle the petitioner to relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5, 112 S.Ct. 1715, 118 L.Ed.2d 3318 (1992). The fact-finding procedures in death-penalty cases are subject to a "heightened standard of reliability," given that "execution is the most irremediable and unfathomable of penalties; * * * death is different." *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (plurality); *see also State v. Bonnell*, 159 Ohio St.3d 1413, 2020-Ohio-3276, 147 N.E.3d 647 (Donnelly, J., dissenting) (describing the extremely

problematic nature of trial courts' reluctance to conduct evidentiary hearings on postconviction petitions in death-penalty cases).

{¶ 73} The trial court denied Bethel's 2018 motions for new a trial and for postconviction relief without holding an evidentiary hearing. Because Bethel made an adequate showing that he may be entitled to a new trial, I would hold that the trial court's decision not to hold an evidentiary hearing was erroneous. Accordingly, I dissent, and I would remand the cause to the trial court for an evidentiary hearing on Bethel's claims.

STEWART, J., concurs in the foregoing opinion.

_____

Janet A. Grubb, First Assistant Franklin County Prosecuting Attorney, and Seth L. Gilbert, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Rachel Troutman, Alison Swain, and Joanna Sanchez, Assistant Public Defenders, for appellant.

Jones Day, Yvette McGee Brown, and Benjamin C. Mizer, urging reversal for amicus curiae, the Innocence Network.

_____