[Cite as *State v. Jones*, 2023-Ohio-2936.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                     :

     Plaintiff-Appellee,                     :
                                       No. 22AP-626
v.                                                      :     (C.P.C. No. 13CR-2345)

Antonio M. Jones,                            :          (ACCELERATED CALENDAR)

     Defendant-Appellant.               :

---

D E C I S I O N

Rendered on August 22, 2023

---

**On brief:** [*Janet A.* Grubb, First Assistant Prosecuting Attorney], and *Seth L.* Gilbert.

**On brief:** *Antonio M. Jones*, pro se.

---

APPEAL from the Franklin County Court of Common Pleas

BOGGS, J.

{¶ 1} Defendant-appellant, Antonio M. Jones ("Jones"), appeals from the judgment of the Franklin County Court of Common Pleas denying his motion for leave to file a motion for a new trial. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} We have previously recounted the history of this case as follows:

By indictment filed May 2, 2013, plaintiff-appellee, State of Ohio, charged Jones with one count of murder, in violation of R.C. 2903.02, an unclassified felony, with an accompanying firearm specification and repeat violent offender specification; one count of felony murder, in violation of R.C. 2903.02, an unclassified felony, with an accompanying firearm specification and repeat violent offender specification; one count of tampering with evidence, in violation of R.C. 2921.12, a third-degree felony, with an accompanying firearm

specification; and one count of having a weapon while under disability, in violation of R.C. 2923.13, a third-degree felony, with an accompanying firearm specification. All the charges related to the shooting death of James Edward Lane on April 20, 2013. Jones entered a plea of not guilty to all charges.

Jones elected to waive his right to a jury trial for Count 4 of the indictment, having a weapon while under disability, and have a bench trial for that charge only. As to the other three charges contained in the indictment, a jury trial commenced June 23, 2014. Officer Trevor Wolfe of the Columbus Division of Police testified that on the night of April 20, 2013, he responded to a dispatch of a shooting to 764 St. Clair Avenue, the location of the Happy Family Bar. When he arrived, he saw Lane with an obvious gunshot wound lying on the ground near a food truck parked at the bar's patio, and Officer Wolfe called for a medic. Officer Wolfe secured the scene until the detectives arrived.

Darren Cunningham, who worked security for the Happy Family Bar, was working the night of the shooting. Though he did not witness the actual shooting, Cunningham testified that an hour prior to the shooting, Jones came into the bar wearing a New York Yankees jacket, was "very amped up," and did not want Cunningham to pat him down. (Tr. Vol. II, 54.) At that time, Cunningham said Jones did not have a weapon on him. Cunningham said that he kept a close eye on Jones while he was in the bar because Jones "kept running back and forth in and out of the door," and he did that "about five or six times consecutively in maybe a ten-minute period." (Tr. Vol. II, 55.) Cunningham said a man inside the bar kept telling Jones to "just calm down." (Tr. Vol. II, 56.) Cunningham described Jones' behavior while he was inside the bar as "very agitated." (Tr. Vol. II, 56.) When Jones left the bar for the last time, Cunningham followed him outside, but he did not see Jones in the parking lot, so he assumed Jones had left for good. Approximately 20 minutes later, Cunningham saw a large crowd of people "stampede in the back door," so Cunningham went outside and saw Lane lying outside on the ground by the patio's back gate. (Tr. Vol. II, 56.)

Vernice Hill, Jones' cousin, testified that she knew Lane as a friend of her mother's, and that she learned that Lane had been shot on April 21, 2013 because her mother told her. Hill said that approximately 24 hours after the shooting, Jones came to her house wearing a New York Yankees jacket, "sweating real bad," and told her that he "shot somebody" at the Happy Family Bar. (Tr. Vol. II, 92.) Jones did not tell Hill who he had

shot, but he indicated he "had some problems with another man." (Tr. Vol. II, 94.) Hill testified that Jones did not say anything to her about anyone pointing a gun at him or threatening his life before the shooting. Jones told Hill he planned to go to Georiga[sic] "to get away from him doing the shooting." (Tr. Vol. II, 94.) While he was at her home, Jones placed a gun in a cabinet under Hill's kitchen sink. He also took off his New York Yankees jacket and placed it on the back of a chair. Jones asked Hill if he could take a shower at her house, and Hill agreed. When Jones was in the shower, Hill went over to her mother's house, and then she returned to her house where Jones was "starting to lay on the couch." (Tr. Vol. II, 99.) Around 7:00 in the morning, Hill went back to her mother's house where she called the police. Police came to Hill's house and arrested Jones. Following Jones' arrest, the police searched Hill's home and recovered the gun and the jacket.

Christopher Lewis, who was operating a food truck outside of the Happy Family Bar on April 20, 2013, testified that prior to the shooting, he saw Jones wearing a New York Yankees jacket, and he saw him get a gun out of the trunk of a car and place it in his pants. Lewis said Jones then went through the patio gate and into the bar. A few minutes later, Lane came to Lewis' food truck and ordered some food. Lewis had just turned around to face Lane when he saw Jones with the gun and then heard "maybe five, six shots." (Tr. Vol. II, 121.) Lewis testified he did not hear any arguments or threats just prior to the shooting. Lewis hid behind his barbeque smoker for a brief time, then came out and saw Lane on the ground saying "I'm hit, I'm hit." (Tr. Vol. II, 124.) Lewis saw Jones run away from the parking lot after the shooting toward St. Clair Avenue. Lewis did not see anyone other than Jones with a gun and said no one else fired a gun that night. On cross-examination, Lewis said it was possible he was mistaken about how many shots he heard that night.

Detective Lowell Titus of the Columbus Division of Police's assault squad testified he responded to the Happy Family Bar the night of the shooting because homicide detectives initially thought Lane had stabilized and would survive his injuries. Detective Titus said he spoke with the owner of the Happy Family Bar in order to obtain the surveillance video of the inside of the bar, the patio, and the parking lot. Detective Titus testified he spoke with Hill, and based on the information Hill provided to him, Detective Titus filed a warrant for Jones' arrest. After reviewing the surveillance video from both inside and outside the bar, Detective Titus said he did not see anyone

pull a gun on Jones. The state played the surveillance video of the parking lot and patio area in court for the jury to see. The video showed Jones walking toward a group of three people, then Jones walking away from the group. The video further showed that Jones was facing away from the direction he ultimately fired when he pulled the gun out, and he then turned back around with the gun before firing. Detective Titus could not tell from viewing the video how many times Jones fired his gun.

During Detective Titus' testimony, the state played the audio recording of Detective Titus' interview with Jones following his arrest. Jones said during the interview that he had problems with a man at the Happy Family Bar. Jones said that 25 or 30 minutes before the incident occurred, the man pulled a gun on him. He said that he was outside when the man "jumped" him, so Jones reached for his gun and shot the man, though Jones said "the bullet wasn't meant for the dude" and that he hit the wrong guy. (Tr. Vol. III, 182.) Jones said he only fired his gun one time. Jones told Detective Titus that the man he had been aiming for took off running after Jones fired his weapon. Jones said he did not know who any of the men were that he argued with at the bar. Jones said he stashed his gun in the bushes while he was inside the bar, then retrieved it from the bushes when he needed it.

Kenneth Gerston, M.D., a deputy coroner with the Franklin County Coroner's Office, testified that Lane died from a gunshot wound. The bullet entered Lane's body through his right arm and traveled into the right side of his chest. Mark Hardy, a forensic scientist with the Columbus Division of Police, testified that he analyzed the spent projectile recovered from Lane's body and that the spent projectile matched the gun police recovered from underneath Hill's sink.

Jones testified in his own defense. Jones stated he had often been on the receiving end of violence, saying he had been shot 12 times, stabbed 3 times, and run over by a vehicle 1 time, resulting in many hospitalizations. Turning to the events of April 20, 2013, Jones testified that he was arguing with someone at the Happy Family Bar and that the man showed him a pistol. Because of his history of being a victim of violence, Jones said he did not want to leave after seeing the man's gun because he was "scared." (Tr. Vol. IV, 264.) Instead of leaving, Jones said he went outside and retrieved his own gun and "put it on [his] waistline." (Tr. Vol. IV, 265.) When he encountered the man again, Jones said the man told him "I'm

going to kill you." (Tr. Vol. IV, 265.) Jones said he started to walk away but he saw the man reaching and he saw a "brown handle," so Jones grabbed his gun and fired a shot because he has "been going through a lot in [his] lifetime and [he] learned about turning [his] back." (Tr. Vol. IV, 265.) He said he "wasn't trying to hurt nobody," but that his "life was on the line," so he did "what [he] had to do." (Tr. Vol. IV, 265.) Jones denied ever telling Hill he planned to get out of Columbus after the shooting. On cross-examination, Jones said he "hit the wrong guy" when he fired his gun. (Tr. Vol. IV, 292.)

Following deliberations, the jury returned guilty verdicts for both murder counts and the tampering with evidence count, as well as the accompanying firearm specifications. The parties stipulated to Jones' prior convictions, and the trial court found Jones guilty of having a weapon while under disability and the repeat violent offender specifications. Following a sentencing hearing on September 12, 2014, the trial court merged Count 2, felony murder, into Count 1, murder, and sentenced Jones to an aggregate sentence of 33 years to life. The trial court journalized Jones' convictions and sentence in a September 15, 2014 judgment entry.

*State v. Jones*, 10th Dist. No. 14AP-796, 2015-Ohio-2357, ¶ 2-11 ("*Jones I*"). This court affirmed Jones's convictions on direct appeal. *Id.*

{¶ 3} On July 28, 2015, Jones filed a motion for a new trial based on newly discovered evidence under Crim.R. 33. After the state filed a memorandum in opposition, pointing out that Jones's motion was untimely and that he had not sought leave of court to file it, Jones filed a motion for leave to file a motion for a new trial. On December 18, 2015, the trial court denied the motion for leave, finding that the evidence that Jones had alleged was newly discovered was, in fact, evidence that had been turned over to Jones's counsel in discovery. Jones appealed that decision, and this court affirmed. *State v. Jones*, 10th Dist. No. 16AP-13, 2016-Ohio-5387 ("*Jones II*").

{¶ 4} On September 2, 2022 Jones filed another motion for leave to file a motion for a new trial based on newly discovered evidence under Crim.R. 33. In support of that motion, Jones submitted the same evidence that was submitted with his 2015 motion as well as informational summaries of two police interviews and an index page of informational summaries.

{¶ 5}    On October 4, 2022 the trial court denied Jones's motion on the basis that the evidence Jones points to was not "new evidence" for purposes of Crim.R. 33 and that Jones "was not unavoidably prevented from discovering the reports at issue." Jones had argued that, in *Jones II*, this court had improperly imposed a time limit for filing motions for a new trial, in contravention of *State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783. However, the trial court noted that Jones's 2015 motion was denied not because Jones failed to file his motion within a reasonable amount of time but because he had not been "unavoidably prevented from discovering the reports at issue." Jones now appeals the trial court's denial of his September 2, 2022 motion.

## II.  ASSIGNMENTS OF ERROR

{¶ 6}    Jones raises the following assignments of error:

(1) Appellant contends that the trial court has denied him substantive due process and equal protection of the law under the 1st, 6th, and 14th Amendments to the United States Constitutions where it denied appellants application to file a delayed new trial based upon newly discovered evidence without first holding a[n] evidentiary hearing to determine the unavoidably prevented aspect of the statutory process.

(2) Appellant contends that the trial court denied him substantive due process and equal protection of law under the 1st, 5th, and 14th Amendments to the United States Constitutions when it failed to function in the manner in which it was designed for, and resolve the controversies between the parties, and as such denying Appellant meaningful access to the courts and the right to petition the government for regress of injuries, by committing acts of constitutional avoidance.

## III.  ANALYSIS

{¶ 7}    Jones's assignments of error both argue that the trial court erred in denying his motion for leave to file a motion for a new trial. In *Hatton*, the Supreme Court of Ohio noted that a defendant must show by clear and convincing evidence that they were unavoidably prevented from discovering the evidence they wish to rely upon for their motion for a new trial. *State v. Hatton*, 169 Ohio St.3d 446, 2022-Ohio-3991. "The sole question before the trial court when considering whether to grant leave is whether the

defendant has established by clear and convincing proof that he was unavoidably prevented from discovering the evidence on which he seeks to base the motion for a new trial." *Id*. at ¶ 30.

{¶ 8}   However, before we turn to his assignments of error, we note that much of the evidence that Jones offers in support of his motion has already been rejected as "newly discovered" by the trial court, and this court, in relation to his 2015 motion.  The trial court found that the evidence did not constitute newly discovered evidence and that he was not unavoidably prevented from discovering any of those materials as they were already in the possession of his counsel.  This court, in considering Jones's 2015 motion on appeal, noted that:

> [t]hese reports were turned over to the defense in discovery. This is a fact even Jones does not deny.  Since the defense had the reports, they could have "discovered and produced [them] at trial."  Crim.R. 33(A)(6).  We acknowledge that the documents in question are marked "COUNSEL ONLY" and thus would not have been shared with Jones personally pursuant to Ohio Rule of Criminal Procedure 16(C).  The fact that defense counsel was not permitted to actually show them to Jones does not mean that Jones, as a represented "party" was "unavoidably prevented from [] discover[ing]" them—they were in the defense attorney's possession. *State v. D.M.*, 10th Dist. No. 15AP-603, 2015-Ohio-4257, ¶ 11; *State v. Wilson*, 10th Dist. No. 02AP-1350, 2003-Ohio-5892, ¶ 12; Crim.R. 33(B).

*State v. Jones*, 10th Dist. No. 16AP-13, 2016-Ohio-5387, ¶ 9.

{¶ 9}   In his September 2022 motion, Jones presented the same arguments based on the same "newly" discovered evidence that he presented in his 2015 motion.  Those arguments are barred by res judicata.  "[A]ny issue that could have been raised on direct appeal and was not is res judicata and not subject to review in subsequent proceedings." *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, ¶ 16, citing *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, ¶ 37, and *State v. D'Ambrosio*, 73 Ohio St.3d 141, 143 (1995). "Res judicata applies to bar raising piecemeal claims in successive motions filed after the defendant is convicted."  (Internal quotations and citations omitted.) *State v. Battin*, 10th Dist. No. 18AP-888, 2019-Ohio-2195, ¶ 13.   "Thus, the doctrine serves to preclude a defendant who has had his day in court from seeking a second on that same issue. In so doing, res judicata promotes the principles of finality and judicial economy by preventing

endless relitigation of an issue on which a defendant has already received a full and fair opportunity to be heard." *Saxon* at ¶ 18, citing *State ex rel. Willys-Overland Co. v. Clark*, 112 Ohio St. 263, 268 (1925). Here, Jones is attempting to relitigate his 2015 motion and resurrect his efforts to seek a new trial but those arguments Jones offers are now barred under res judicata.

{¶ 10} While Jones's September 2022 motion contains additional materials from his 2015 motion, we find that the additional materials are similarly barred by res judicata. As stated above "[r]es judicata applies to bar raising piecemeal claims in successive motions filed after the defendant is convicted." *Battin* at ¶ 13. Jones offers no evidence that these documents were discovered after his 2015 motion and therefore should have been offered at that time. Having found that Jones's arguments are barred by res judicata we overrule both of his assignments of error.

## IV. CONCLUSION

{¶ 11} For the reasons stated above, we overrule both of Jones's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT, P.J., and MENTEL, J., concur.

———————