[Cite as *State v. Wilson*, 2023-Ohio-4771.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 23AP-36<br>(C.P.C. No. 03CR-7102) |
| Demetrius R. Wilson, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 27, 2023

**On brief:** [*Janet Grubb*, First Assistant Prosecuting Attorney], and *Kimberly M. Bond*, for appellee.

**On brief:** *The Law Office of Eric J. Allen Ltd.*, and *Eric J. Allen*, for appellant. **Argued:** *Eric J. Allen.*

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendant-appellant, Demetrius R. Wilson, appeals from a judgment of the Franklin County Court of Common Pleas denying his motion for leave to file a motion for new trial based on newly discovered evidence.

I. Facts and Procedural History

{¶ 2} On October 24, 2003, appellant was indicted on two counts of aggravated murder, in violation of R.C. 2903.01, two counts of attempted aggravated murder, in violation of R.C. 2923.02/2903.01, and one count of having a weapon while under disability, in violation of R.C. 2923.13. The matter came for trial before a jury beginning January 25, 2005.

{¶ 3} The following summary of the evidence presented at trial is drawn from this court's decision in *State v. Wilson*, 10th Dist. No. 05AP-277, 2006-Ohio-643 ("*Wilson I*"), following appellant's direct appeal of his convictions for murder and attempted murder. The indicted charges arose out of "a September 21, 2003 shooting. Specifically, the aggravated murder charges stem from appellant fatally shooting Fortino Guzman-Gutierrez ("Guzman") and Jose Isabel Sandoval-Zarko ("Zarko"), and the attempted aggravated murder charges pertain to appellant shooting Leonel Saucedo and Rashaad Marshall." *Id.* at ¶ 3.

{¶ 4} Appellant entered a not guilty plea and elected to have a bench trial on the weapons under disability charge and a jury trial as to the remaining charges. At trial, Clinton Township Police Sergeant Phillip Perry testified that "[o]n the evening of September 21, 2003," he was dispatched to "Dreamer's Lounge," where he found Marshall "outside the bar. Marshall was frightened and had a wound to his left forearm and in his chest area. Marshall told Sergeant Perry that a Hispanic male shot him." *Id.* at ¶ 4.

{¶ 5} Mifflin Township Police Officer Denny Blust testified he investigated the shooting scene. Officer Blust observed "someone had fatally shot Guzman, and someone shot Zarko in the back. Zarko was alive at the time, and medics transported him to the hospital." *Id.* at ¶ 5.

{¶ 6} On September 21, 2003, Allison Gamble "lived in an apartment near where the * * * shooting took place." *Id.* at ¶ 6. Gamble testified that, on that date, she "drank alcohol and smoked marijuana with individuals that included appellant, Marshall, Franklin Watkins, and Harold Warner." *Id.* Appellant talked that evening "about robbing Mexicans. Appellant also had a firearm in his pants waistband." *Id.* at ¶ 7. During the "course of events, appellant, Marshall, Watkins, and Warner left the apartment, and Gamble stayed at the apartment. Twenty minutes later, Gamble heard six to seven gunshots." *Id.*

{¶ 7} Franklin County Sheriff Detective Mike Kirkpatrick testified that "he spoke with Marshall at the hospital during the early morning hours of September 22, 2003. According to Detective Kirkpatrick, Marshall stated that he did not shoot anyone and that a Hispanic male shot him." *Id.* at ¶ 8. Detective Kirkpatrick "took evidence from Marshall's hands for gunshot residue testing." *Id.*

{¶ 8} On the evening of September 21, 2003, Watkins "socialized at Gamble's apartment with individuals including Gamble, Warner, Marshall, appellant, and appellant's brother." *Id.* at ¶ 9. Watkins testified that he "[s]ubsequently * * * walked with Warner, Marshall, appellant, and appellant's brother to a nearby store. On the way to the store, Marshall told the group that Watkins 'told on him' for stealing a video game machine." *Id.* According to Watkins "[a]ppellant stated that he 'would kill anyone who would snitch on him.' " *Id.*

{¶ 9} After the group "returned to the apartment, appellant and Marshall talked about robbing Mexicans that lived nearby. Marshall had a firearm earlier that evening, but appellant had that same firearm in his pants waistband while talking about the robbery." *Id.* at ¶ 10. Shortly thereafter, "Marshall, appellant, appellant's brother, and a 'tall guy' went toward the area where the Mexicans lived. * * * Warner joined the group later, and Watkins eventually joined them." *Id.* At the time "Watkins joined the group, he and Warner discussed robbing a pizza delivery person. While Watkins called to order the pizza, he heard two gunshots and started to run away." *Id.* Watkins subsequently "heard six or seven more gunshots when he ran across the street. Watkins then saw appellant running toward him, and appellant had the firearm." *Id.*

{¶ 10} On the evening of September 21, 2003, "Saucedo socialized with Zarko and Guzman outside an apartment complex. Two black men approached, and one of them asked for beer." *Id.* at ¶ 11. Saucedo handed the man "two beers and then continued to talk with his friends. Thereafter, the man who asked for the beer grabbed Guzman, put a firearm to his head, and shot him. Instantly, the man then shot Zarko and Saucedo. The bullet grazed the left side of Saucedo's chest." *Id.*

{¶ 11} Law enforcement subsequently "spoke with Saucedo about the shooting and asked Saucedo to identify the shooter in a photo array. Saucedo identified appellant as the shooter." *Id.* at ¶ 12. During direct-examination, "Saucedo testified that the location of the shooting was not well-lit and that he remembered the shooter's face 'a little bit.' " *Id.* at ¶ 13. Saucedo "conceded on cross-examination that he did not see the shooter's face clearly and that the 'black men' in the photo array 'appeared to be a little bit similar.' " *Id.*

{¶ 12} Warner testified that he "socialized with individuals that included Gamble, Watkins, Marshall, appellant, and appellant's brother during the evening of September 21,

2003." *Id.* at ¶ 14.  At some point that night, "Warner, Marshall, Watkins, and appellant walked to a nearby store.  While walking to the store, Marshall mentioned that Watkins 'told on him' for stealing a video game machine.  Appellant responded: ' "I don't want nobody snitching on me." ' " *Id.*  Appellant and Marshall subsequently "started talking about robbing Mexicans who lived nearby.  The group walked toward the area where the Mexicans lived.  Appellant then pointed a firearm at a Mexican woman holding a baby and stated: ' "I could pop her like from here." ' " *Id.* at ¶ 15.

{¶ 13}  In the meantime, "Warner decided that the group should rob a pizza delivery person instead.  Watkins used his cell phone to order pizza.  Appellant and Marshall walked away and, thereafter, Warner heard gunshots." *Id.* at ¶ 16.  Warner then observed "appellant shooting a firearm, although Warner did not see whom appellant was shooting.  Warner and Watkins started to run, and appellant, carrying the firearm, ran toward them and stated: ' "I shot the mother fucker." ' " *Id.*

{¶ 14}  Franklin County Sheriff Detective Chris Floyd "spoke with Warner about the shooting," and "Warner provided information" to the detective.  *Id.* at ¶ 17.  Warner stated "he was a closer friend with Marshall than appellant, and Warner admitted that he was previously charged with falsification, but pled to a misdemeanor disorderly conduct under a plea bargain." *Id.*

{¶ 15}  Marshall testified he was "socializing with individuals including appellant, Gamble, Watkins, and Warner on the evening of September 21, 2003.  Marshall never had a firearm that evening, but appellant did." *Id.* at ¶ 18.  During the events that evening, "Marshall, Warner, Watkins, and appellant walked to a nearby store.  On the way to the store, Marshall confronted Watkins about Watkins revealing that Marshall stole a video game machine.  Appellant 'said that if somebody snitched on him he felt that he would kill them.' * * * Marshall thought that appellant was joking." *Id.* at ¶ 19.

{¶ 16}  Later, "the group returned to Gamble's apartment complex, and [they] talked about robbing a pizza delivery person.  Meanwhile, appellant and Marshall left the group and approached some Mexicans that lived nearby." *Id.* at ¶ 20.  Marshall "asked one of the Mexicans for a beer.  The Mexican, Guzman, gave Marshall a beer and appellant grabbed Guzman and shot him in the head.  Marshall did not expect this to happen, stating: 'As far as I know it was robbing the pizza place, and when [appellant] told me to walk with him[,]

I walked with him.' " *Id.* Appellant next "turned toward Marshall and pointed the firearm toward Marshall. Marshall tried to grab the firearm, but appellant shot Marshall. Marshall fled and heard six to seven more shots. Marshall went to Dreamer's Lounge to ask for help because he was bleeding and could not breathe." *Id.* Medics transported Marshall to a hospital, where "a law enforcement officer took samples from Marshall's hands for a gunshot residue test." *Id.* at ¶ 21.

{¶ 17} During direct examination, Marshall "admitted that he first told law enforcement that a Mexican shot him, and that he lied when he made that statement. Marshall further noted that he later falsely told law enforcement that an 'unknown subject approached' him and shot him." *Id.* at ¶ 22. Marshall also admitted to "telling law enforcement that a drug dealer named 'G' shot him, and that he again lied when he made that statement." *Id.* Marshall, however, "verified that he ultimately told law enforcement the truth, which was that appellant shot him." *Id.*

{¶ 18} Marshall testified plaintiff-appellee, State of Ohio, "charged him with three counts of felony obstruction of justice because of his failure to initially tell the truth about the shooting," and he acknowledged the state "allowed him to plead to one count of obstruction of justice with the possibility of community control in exchange for him testifying against appellant." *Id.* at ¶ 23.

{¶ 19} On cross-examination, Marshall acknowledged "he previously told Warner that appellant was not trying to shoot him, but was trying to protect his life," and Marshall "also stated on cross-examination that he gave different accounts of the incident because he was scared 'for [his] life' due to appellant's actions." *Id.* at ¶ 24.

{¶ 20} Martin Lewis, a forensic scientist, "examined the gunshot residue test samples that law enforcement took from Marshall's hands" and "he found no gunshot residue from the samples." *Id.* at ¶ 25.

{¶ 21} Detective Floyd testified he learned "Guzman was dead at the crime scene and that Zarko died at the hospital. Next, Detective Floyd spoke with Marshall about the incident, and Marshall originally indicated that a light-skinned man, either black or Hispanic, shot him. Thereafter, Marshall indicated that a man nicknamed 'G' shot him." *Id.* at ¶ 26. Marshall "[u]ltimately * * * confessed that appellant was the shooter. Detective Floyd then asked Marshall to identify appellant in a photo array, but Marshall refused,

stating that he was afraid for his family." *Id.* Marshall asked the detective what he "was 'going to do for him.' " *Id.* Later, "Marshall identified appellant in the photo array." *Id.*

{¶ 22} Detective Floyd also interviewed Saucedo about the incident, and "Saucedo identified appellant in a photo array as the shooter. Detective Floyd also showed Saucedo a photo array with Marshall's photograph, but Saucedo was unable to pick anyone out of that photo array." *Id.* at ¶ 27. The detective also spoke with "Gamble, Watkins, and Warner," and they "provided information about appellant's identity and activities during the evening of September 21, 2003. Eventually, Detective Floyd issued a warrant for appellant's arrest, and appellant surrendered himself at the jail on October 20, 2003." *Id.* At the time he went to jail, appellant "had no gunshot wounds." *Id.*

{¶ 23} Dr. Patrick Fardal, from the Franklin County Coroner's Office, testified "that Zarko 'died as a result of [a] gunshot wound to the trunk, injuries to the thoracic spinal cord and to the right lung and subsequent internal bleeding.' " *Id.* at ¶ 30. He stated that "Guzman 'died solely and exclusively as a result of suffering a contact gunshot wound to his head which was perforation of the skull and brain, along with a secondary gunshot wound to the trunk, which caused injuries to his left lung.' " *Id.*

{¶ 24} Following deliberations, the jury returned verdicts finding appellant "not guilty of the aggravated murder charges, but guilty of the lesser-included offenses of murder in regards to the death of Guzman and Zarko," and the jury "also found appellant not guilty of the attempted aggravated murder charges, but guilty of the lesser-included offenses of attempted murder in regards to the shooting of Saucedo and Marshall." *Id.* at ¶ 31. The jury further found appellant "guilty on all accompanying firearm specifications," and the state "dismissed the weapon under disability charge." *Id.*

{¶ 25} The trial court "sentenced appellant to 15 years to life imprisonment on each of the murder convictions and nine years imprisonment on each of the attempted murder convictions." *Id.* at ¶ 32. The court "merged the firearm specifications," sentencing appellant to "three years imprisonment on the merged specifications," and ordering appellant to "serve each prison term consecutively." *Id.*

{¶ 26} Appellant filed a direct appeal raising three assignments of error in which he argued: (1) his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, (2) the trial court erred in sentencing him to consecutive

sentences, and (3) the court erred in sentencing him to terms of actual incarceration which were longer than the minimum terms. In *Wilson I*, this court overruled appellant's assignments of error challenging the sufficiency and weight of the evidence and the court's imposition of consecutive sentences. This court sustained appellant's third assignment of error, holding the trial court "did not make the requisite R.C. 2929.14(B) findings when imposing non-minimum sentences on appellant's attempted murder convictions." *Id.* at ¶ 63. We therefore affirmed in part and reversed in part the judgment of the trial court and remanded the matter for the court to "follow the proper procedure to impose non-minimum sentences." *Id.*

{¶ 27} On January 19, 2007, the trial court conducted a re-sentencing hearing. By judgment entry filed February 22, 2007, the trial court imposed the same sentence. Appellant appealed that judgment and, in *State v. Wilson*, 10th Dist. No. 07AP-224, 2007-Ohio-4801 ("*Wilson II*"), this court affirmed the judgment of the trial court.

{¶ 28} On August 7, 2020, appellant filed a motion for leave to file a motion for new trial. In the accompanying memorandum, appellant asserted that Marshall had recanted his trial testimony in which he identified appellant as the shooter. Attached as an exhibit to the motion was an undated affidavit of Marshall (hereafter the "First Marshall Affidavit"), who averred in part the detectives in this case "pressured affiant into stating it was [appellant] who had shot him. In fact, it was not [appellant] who shot him. It was an unknown man who killed the two Latinos." (First Marshall Affidavit at ¶ 2.) Marshall further averred: "[H]e did testify against [appellant] and said he was the shooter. This was completely false. He is speaking out now because he knows [appellant] did not shoot him." (First Marshall Affidavit at ¶ 3.) According to Marshall, "he has only recently come forward because he has felt bad about [appellant] being in prison for something he did not do," and he did not speak out sooner "because he was afraid the police would pin the murder on him." (First Marshall Affidavit at ¶ 5.)

{¶ 29} On September 9, 2020, the state filed a memorandum in opposition to appellant's motion for leave to file a motion for new trial. In its memorandum, the state argued in part that the affidavit of Marshall could not be considered new evidence as the statement in the affidavit was consistent with his initial statement to responding officers at the scene. The state further argued appellant had not presented clear and convincing

evidence that he was unavoidably prevented from discovering the alleged new evidence in a timely manner.

{¶ 30} By decision and entry filed November 19, 2020, the trial court denied appellant's motion for leave to file a motion for new trial. Appellant filed an appeal from the trial court's entry, raising two assignments of error in which he asserted the trial court erred in: (1) denying his motion for leave, and (2) failing to hold an evidentiary hearing.

{¶ 31} In *State v. Wilson*, 10th Dist. No. 20AP-556, 2021-Ohio-3046 ("*Wilson III*"), this court overruled both assignments of error and affirmed the judgment of the trial court. In that decision, this court held in part that "appellant failed to establish by clear and convincing evidence that he was unavoidably prevented from discovering the evidence he now wishes to bring forward." *Id.* at ¶ 31.

{¶ 32} On September 16, 2022, appellant filed a second motion for leave to file a motion for new trial based on newly discovered evidence. Appellant argued the new evidence came in the form of an affidavit by Marshall, in which he averred detectives pressured him into stating appellant had shot him, and that "[i]t was an unknown man who killed the two Latinos." (Sept. 16, 2022 Mot. for Leave at 5.) Appellant also cited a recent Supreme Court of Ohio decision, *State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, for the proposition that a defendant " 'satisfies the "unavoidably prevented" requirement' " for a *Brady* claim by " 'establishing that the prosecution suppressed the evidence on which the defendant relies.' " (Sept. 16, 2022 Mot. for Leave at 7, quoting *Bethel* at ¶ 25.) *Brady v. Maryland*, 373 U.S. 83 (1963). Appellant requested an evidentiary hearing on the motion.

{¶ 33} Attached to the motion was the affidavit of Marshall (hereafter the "Second Marshall Affidavit"), dated June 27, 2022. Similar to the affidavit filed with appellant's first motion for leave, Marshall averred: "The [d]etectives in the case pressured affiant into stating it was [appellant] who had shot him. In fact, it was not [appellant] who shot him. It was an unknown man who killed the two Latinos." (Second Marshall Affidavit at ¶ 2.) In his latest affidavit, Marshall additionally averred: "The detectives and the prosecutor told him that he must testify this way," and they "told him that he would be prosecuted if he testified any other way." (Second Marshall Affidavit at ¶ 3.)

{¶ 34} On September 22, 2022, the state filed a memorandum opposing appellant's motion for leave, arguing appellant "has never raised a *Brady* claim," and that "Marshall's

current recantation is not prima facie evidence of a *Brady* claim." (State's Memo Opposing Mot. for Leave at 5.)    The state further argued appellant's "current motion is merely attempting to relitigate his request for leave to file a motion for new trial," and that there was no difference in the content of Marshall's 2022 affidavit and the affidavit of Marshall that appellant "submitted to support his 2020 pleading." (State's Memo Opposing Mot. for Leave at 6.)

{¶ 35} On December 27, 2022, the trial court filed a decision and entry denying appellant's motion for leave without a hearing. In its decision, the trial court analyzed the motion based on the recent decision in *Bethel*, holding in part that appellant "cannot circumvent the 'unavoidably prevented' requirement of Crim.R. 33(B) by asserting *Brady* violations now, because [appellant] failed to produce clear and convincing evidence of such a violation." (Dec. 27, 2022 Decision & Entry at 10.) The trial court further found "the doctrine of res judicata bars [appellant] from arguing a *Brady* violation now or from re-litigating the issue of 'unavoidable prevention' under Crim.R. 33(B)." (Dec. 27, 2022 Decision & Entry at 9.)

## II. Assignments of Error

{¶ 36}    Appellant appeals and assigns the following two assignments of error for our review:

> [I.] THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR LEAVE.
>
> [II.] THE TRIAL COURT ERRED IN NOT HOLDING AN EVIDENTIARY HEARING.

## III. Analysis

{¶ 37} Appellant's assignments of error are interrelated and will be considered together. Under these assignments of error, appellant asserts the trial court erred in: (1) denying his motion for leave to file a motion for new trial, and (2) failing to conduct an evidentiary hearing on the motion.

{¶ 38} A trial court's ruling on a motion for leave to file a motion for new trial "is reviewed for an abuse of discretion." *State v. McNeal*, 169 Ohio St.3d 47, 2022-Ohio-2703, ¶ 13. Further, "[a] trial court's decision whether to conduct an evidentiary hearing on a motion for leave to file a delayed motion for new trial is also discretionary." *State v.*

*Dodson*, 10th Dist. No. 22AP-388, 2023-Ohio-701, ¶ 14, citing *State v. Hoover-Moore*, 10th Dist. No. 14AP-1049, 2015-Ohio-4863, ¶ 14.  In this respect, " ' [a] criminal defendant "is only entitled to a hearing on a motion for leave to file a motion for a new trial if he submits documents which, on their face, support his claim that he was unavoidably prevented from timely discovering the evidence at issue." ' " *Id.*, quoting *State v. Ambartsoumov*, 10th Dist. No. 12AP-878, 2013-Ohio-3011, ¶ 13, quoting *State v. Cleveland*, 9th Dist. No. 08CA009406, 2009-Ohio-397, ¶ 54, citing *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, ¶ 7 (2d Dist.).

{¶ 39} As noted under the facts, appellant sought leave to file a motion for new trial based on newly discovered evidence.  Crim.R. 33(A)(6) provides that a trial court may grant a defendant a new trial "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial."  Under Crim.R. 33(B), "when a new-trial motion is premised on newly discovered evidence, the defendant must file the motion within 120 days of the date of the jury's verdict or the trial court's decision in a bench trial."  *McNeal* at ¶ 15.  However, "Crim.R. 33(B) excuses a defendant's failure to move for a new trial within the * * * 120-day deadline * * * if the defendant proves by clear and convincing evidence that he or she was unavoidably prevented from discovering the evidence on which the motion would be based within that time."  *Id.* at ¶ 16.

{¶ 40} Under Ohio law, "[a] defendant is unavoidably prevented from discovering new evidence if he 'had no knowledge of the existence of the new evidence and, in the exercise of reasonable diligence, could not have learned of its existence within the time prescribed for filing a motion for new trial.' "  *Dodson* at ¶ 16, quoting *State v. Lundy*, 10th Dist. No. 19AP-505, 2020-Ohio-1585, ¶ 11.

{¶ 41} In *Bethel*, the Supreme Court addressed the issue of the "unavoidably prevented" requirement of Crim.R. 33(B) in the context of a criminal defendant seeking leave to file a motion for new trial based on a claim the state withheld evidence in violation of *Brady*.  Specifically, the court in *Bethel* considered whether a defendant asserting a *Brady* claim is required to show "he could not have discovered the evidence by exercising reasonable diligence."  *Bethel* at ¶ 21.  Noting "[i]t is well settled that a defendant is entitled to rely on the prosecution's duty to produce evidence that is favorable to the defense," the

court held that "[a] defendant seeking to assert a *Brady* claim therefore is not required to show that he could not have discovered suppressed evidence by exercising reasonable diligence." *Id.* at ¶ 25. Rather, a defendant "may satisfy the 'unavoidably prevented' requirement contained in Crim.R. 33(B) by establishing that the prosecution suppressed the evidence on which the defendant would rely in seeking a new trial." *McNeal* at ¶ 17, citing *Bethel* at ¶ 25, 59.

{¶ 42} In the present case, the trial court, in considering appellant's second motion for leave to file a motion for new trial, noted that, at the time of this court's 2021 decision in *Wilson III*, the Supreme Court "had not yet issued its March 22, 2022 decision in *State v. Bethel*, * * * which altered the analysis for motions seeking leave to file untimely new-trial motions." (Dec. 27, 2022 Decision & Entry at 6.) The trial court therefore analyzed appellant's "instant September 16, 2022 motion in light of *Wilson III*, as modified by *Bethel*." (Dec. 27, 2022 Decision & Entry at 7.) Specifically, the trial court addressed the holding in *Bethel* that defendants seeking to assert a *Brady* claim may satisfy the unavoidably prevented requirement "if they can establish that the prosecution suppressed the evidence on which they rely in violation of *Brady*." (Dec. 27, 2022 Decision & Entry at 8-9, citing *Bethel*.)

{¶ 43} The trial court initially found appellant "could have asserted a *Brady* violation in his first-filed motion for leave" but "he did not." (Dec. 27, 2022 Decision & Entry at 9.) In addressing whether the state carried its burden of showing appellant could have "asserted this *Brady* claim in 2020," the trial court determined "a comparison of the two Marshall affidavits * * * reveal that [appellant's] new *Brady* argument is based substantially on the same factual information he provided the Court in 2020." (Dec. 27, 2022 Decision & Entry at 9.) The trial court concluded "the doctrine of res judicata bars [appellant] from arguing a *Brady* violation now or from re-litigating the issue of 'unavoidable prevention' under Crim.R. 33(B)." (Dec. 27, 2022 Decision & Entry at 9.)

{¶ 44} Notwithstanding its finding of res judicata, the trial court also addressed and rejected appellant's contention that he offered proof of a *Brady* violation, holding in part:

> [I]t is difficult to determine what information [appellant] claims was suppressed by the State. The State did not suppress Marshall's new allegation that a "man in a hoodie" committed the crimes. [Appellant] was aware that Marshall had previously alleged—and recanted—that an "unknown

subject" committed the crime. The State did not suppress the pressure that it had placed on Marshall because Marshall testified about the plea agreement he had reached in exchange for his testimony. The State did not suppress facts questioning Marshall's general credibility as Marshall's own testimony discussed the various versions of the event he had told.

(Dec. 27, 2022 Decision & Entry at 9-10.)

{¶ 45} In light of the above, the trial court concluded appellant "failed to produce clear and convincing evidence" of a *Brady* violation. (Dec. 27, 2022 Decision & Entry at 10.) Having found that appellant failed to show a *Brady* violation, the trial court therefore determined appellant "cannot circumvent the 'unavoidably prevented' requirement of Crim.R. 33(B) by asserting *Brady* violations now." (Dec. 27, 2022 Decision & Entry at 10.)

{¶ 46} In *Brady*, "the Supreme Court held that the Fourteenth Amendment to the United States Constitution is violated where a state 'withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.' " *Dodson* at ¶ 28, quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012). There are three components to a *Brady* violation: " 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Id.*, quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Further, "[a] *Brady* violation involves the post-trial discovery of information that was known to the prosecution, but unknown to the defense." *Id.*, citing *United States v. Agurs*, 427 U.S. 97, 103 (1976). A criminal "defendant 'bears the burden of proving a *Brady* violation and consequent denial of due process.' " *Id.* at ¶ 30, quoting *State v. Moore*, 10th Dist. No. 11AP-1116, 2013-Ohio-3365, ¶ 43, citing *State v. Jackson*, 57 Ohio St.3d 29, 33 (1991).

{¶ 47} As noted above, in his first motion for leave, filed August 7, 2020, appellant attached the First Marshall Affidavit in which Marshall stated it was not appellant who shot him, and that detectives in the case pressured him into stating it was appellant who shot him. In appellant's second motion for leave to file a motion for new trial, filed September 16, 2022, appellant attached the Second Marshall Affidavit. The two affidavits, as noted by the trial court, are essentially identical with the exception that the Second Marshall Affidavit included the following additional averment by Marshall: "The detectives

and the prosecutor told him that he must testify this way. The detectives and prosecutor told him that he would be prosecuted if he testified any other way. Affiant was told not to speak to anyone from [appellant's] defense team." (Second Marshall Affidavit at ¶ 3.)

{¶ 48} Upon review, the record supports the trial court's determination that appellant failed to specify or demonstrate what evidence was suppressed by the state. As noted by the state, Marshall was a shooting victim who was identified in discovery (and who testified at trial). Further, Marshall's prior inconsistent statements as to the identity of the shooter were revealed to the defense prior to trial, including the assertion in both of his affidavits that "an unknown man" in a hoodie was the shooter. (First Marshall Affidavit at ¶ 2, Second Marshall Affidavit at ¶ 2.)

{¶ 49} At trial, Marshall testified as to his inconsistent statements regarding the identity of the shooter. During direct examination, Marshall acknowledged he initially told the police "a Mexican had shot me." (Tr. Vol. II at 425.) Marshall testified that he "told a bunch of lies" regarding the incident, and that he was charged with obstruction of justice. (Tr. Vol. II at 425.) Marshall also acknowledged that he told police he was drinking with Mexicans and "an unknown subject approached" him and shot him. (Tr. Vol. II at 426.) At one point, Marshall told police "that 'G' or Gurney had shot everyone." (Tr. Vol. II at 426.) Marshall further testified he told police that appellant was the individual who shot him, and "[t]hat's the truth." (Tr. Vol. II at 427.) On cross-examination, Marshall was questioned about his prior statements.

{¶ 50} We also note that Marshall's statements to police during the investigation regarding his inconsistent identifications, including his statement to law enforcement "that an 'unknown subject approached' him and shot him," were detailed in this court's decision on direct appeal. *Wilson I* at ¶ 22. Accordingly, as found by the trial court, appellant has failed to show the state suppressed evidence that an unknown subject committed the crime, nor was defense counsel prevented from raising the defense that someone other than appellant was the actual shooter.

{¶ 51} Similarly, the record supports the trial court's determination that the prosecution did not suppress evidence that Marshall was pressured by detectives or the prosecution to testify against appellant. In *Wilson I*, this court noted Marshall testified at trial that the state "charged him with three counts of felony obstruction of justice because

of his failure to initially tell the truth about the shooting," and Marshall "acknowledged" the state "allowed him to plead to one count of obstruction of justice with the possibility of community control in exchange for him testifying against appellant." *Id.* at ¶ 23. Further, defense counsel was able to question Marshall on cross-examination as to any pressure exerted on him, including his "understanding of your deal." (Tr. Vol. II at 493.) Marshall testified "there's a good chance if I cooperate I could be given probation." (Tr. Vol. II at 494.) Marshall also testified, during cross-examination, that he had spoken with his friend, Warner, who was cooperating with the state, and that "[h]e was trying to coerce me into identifying the shooter." (Tr. Vol. II at 476.)

{¶ 52} Under Ohio law, "there can be no *Brady* violation where the defendant was aware of the evidence allegedly withheld." *State v. Hawk*, 10th Dist. No. 21AP-265, 2021-Ohio-4533, ¶ 20, citing *State v. Zeune*, 10th Dist. No. 13AP-147, 2013-Ohio-4156, ¶ 18, citing *State v. Monroe*, 10th Dist. No. 04AP-658, 2005-Ohio-5242, ¶ 17. As discussed above, the record shows defense counsel was aware at the time of trial of Marshall's identification of an unknown man as the alleged shooter and that Marshall was pressured and entered into a plea agreement in exchange for his testimony. Upon review, the trial court did not abuse its discretion in finding the motion for leave and supporting materials, including the Second Marshall Affidavit, did not support a *Brady* violation based on the suppression of evidence.

{¶ 53} Finding no *Brady* violation (and therefore that appellant did not satisfy the unavoidably prevented requirement by establishing the prosecution suppressed the evidence on which he would rely), the trial court addressed the motion in the context of the Crim.R. 33(B) requirement that a defendant seeking leave must establish, by clear and convincing evidence, that he was unavoidably prevented from discovering the purported new evidence within the 120-day period under Crim.R. 33(B). In discussing that requirement, the trial court was guided by this court's decision in *Wilson III*, in which we held, upon review of the affidavits and materials submitted with the 2020 motion for leave: "[W]e do not find appellant established by clear and convincing proof" that he "(1) had no knowledge of the evidence he now presents, or (2) could not have learned of the substance of Marshall's recantation within 120 days of the verdict through the exercise of reasonable diligence." *Wilson III* at ¶ 23.

{¶ 54} The trial court observed that, although appellant "claimed he did not think Marshall would ever 'tell the truth' about what happened during the September 21, 2003 shooting incident, [appellant] definitely knew Marshall was a witness to the crimes," and "the fact that Marshall was a witness for the [s]tate and thus would have been kept from defense counsel did not persuade the Tenth District because Marshall's inconsistent statements to law enforcement and his credibility were examined at length during trial." (Dec. 27, 2022 Decision & Entry at 7.) The trial court noted that, in light of Marshall's trial testimony regarding his inconsistent statements and his acknowledgement the state charged him with obstruction of justice and allowed him to enter a plea agreement, "the Tenth District could not agree that clear and convincing evidence established that [appellant] had no knowledge of the substance of Marshall's recantation and further that [appellant] could not have learned of the existence of the substance of Marshall's recantation within 120 days of the verdict in this case." (Dec. 27, 2022 Decision & Entry at 8.)

{¶ 55} As indicated above, while the trial court found appellant failed to produce clear and convincing evidence of a *Brady* claim, the court further concluded the doctrine of res judicata precluded appellant from "arguing a *Brady* violation now or from re-litigating the issue of 'unavoidable prevention' under Crim.R. 33(B)." (Dec. 27, 2022 Decision & Entry at 9.) Upon review, we find no error with the trial court's determination that a claim based on *Brady* was barred by res judicata as it could have been raised in the first motion for leave. Nor do we find error with the court's determination that appellant was precluded from re-litigating the issue of whether he was unavoidably prevented from timely discovering the alleged new evidence contained in Marshall's latest affidavit.

{¶ 56} In general, "[t]he doctrine of res judicata prevents repeated attacks on a final judgment and applies to all issues that were or might have been litigated." *Bank of New York v. Jackson*, 8th Dist. No. 99874, 2013-Ohio-5133, ¶ 10, citing *Roger v. Whitehall*, 25 Ohio St.3d 67 (1985). Further, " '[p]rinciples of res judicata prevent relief on successive, similar motions raising issues which were or could have been raised originally.' " (Emphasis omitted.) *Id.*, quoting *Coulson v. Coulson*, 5 Ohio St.3d 12, 17 (1983), citing *Brick Processors, Inc. v. Culbertson*, 2 Ohio App.3d 478 (8th Dist.1981). Thus, "where a new motion simply rephrases issues previously raised and where the facts alleged in successive

motions were available to the appellant at the time he filed his earlier motion, the principles of res judicata bar the later motion." *Id.*, citing *D'Agnese v. Holleran*, 8th Dist. No. 86769, 2006-Ohio-2470, ¶ 6, citing *Bahgat v. Bahgat*, 10th Dist. No. 83AP-469 (Dec. 6, 1984.)

{¶ 57} Here, the issue of appellant's knowledge of the "substance of Marshall's recantation," including averments by Marshall in his first affidavit that he was "pressured by detectives into stating it was appellant who shot and killed the two men" and that "an unknown male" was the shooter, was addressed by this court in appellant's appeal of the trial court's denial of his first motion for leave to file a motion for new trial. *Wilson III* at ¶ 21, 25. While, as addressed above, we find no error with the trial court's determination that appellant failed to produce clear and convincing evidence of a *Brady* violation, we further agree with the trial court that appellant "could have asserted a *Brady* violation in his first-filed motion for leave," but "he did not." (Dec. 27, 2022 Decision & Entry at 9.)

{¶ 58} Further, aside from appellant's attempt to raise a *Brady* claim in his latest motion, this court previously determined that appellant "failed to establish by clear and convincing evidence that he was unavoidably prevented from discovering the evidence he now wishes to bring forward." *Wilson III* at ¶ 31. As found by the trial court in this case, a comparison of the two Marshall affidavits indicates appellant's latest argument "is based substantially on the same factual information he provided" the court in his 2020 motion for leave. (Dec. 27, 2022 Decision & Entry at 9.) Upon review, we find no error with the trial court's conclusion that appellant's attempt to re-litigate the issue of whether he could have obtained Marshall's statements earlier (i.e., whether he was unavoidably prevented from timely discovering the evidence he relied on) is barred by the doctrine of res judicata.

{¶ 59} Finally, notwithstanding the preclusive effect of res judicata, the trial court also found appellant "failed to establish by clear and convincing evidence * * * that he was unavoidably prevented from timely discovering new evidence upon which his leave motion relies." (Dec. 27, 2022 Decision & Entry at 10.) We find no error with that determination, as appellant offered no explanation as to "investigative actions taken before trial or within the 120-day time frame set forth in Crim.R. 33(B)," nor did he adequately "explain why he was unavoidably prevented from discovering the allegedly new evidence upon which he relies as the basis for his motion for leave." *Dodson* at ¶ 24. Accordingly, for the foregoing

reasons, the trial court did not abuse its discretion in denying appellant's motion for leave to file a motion for new trial.

**{¶ 60}** Appellant also contends the trial court erred in failing to conduct a hearing on the motion. Specifically, appellant contends he was entitled to a hearing because he "showed * * * that he was unavoidably prevented from providing this information to the court within the [120] days provided in the rule." (Appellant's Brief at 17.)

**{¶ 61}** In light of our determination that the trial court properly applied the doctrine of res judicata, and where appellant failed to show he was unavoidably prevented from timely discovering the "new" evidence, the trial court did not abuse its discretion in failing to grant a hearing on the motion for leave. *See, e.g.*, *State v. Redd*, 6th Dist. No. L-13-1087, 2013-Ohio-5181, ¶ 23, citing *State v. Russell*, 10th Dist. No. 04AP-1149, 2005-Ohio-4063, ¶ 7 (trial court did not abuse its discretion in denying appellant's motion for leave without a hearing because "application of res judicata to appellant's claims was clear"); *State v. Bush*, 10th Dist. No. 08AP-627, 2009-Ohio-441, ¶ 12 (trial court did not abuse its discretion in denying motion for leave where documents provided by appellant to support his motion for leave to file a motion for new trial did not establish he was unavoidably prevented from obtaining the evidence set forth in affidavit within 120 days after trial).

**{¶ 62}** Based upon the foregoing, appellant's first and second assignments of error are not well-taken and are overruled.

## IV. Conclusion

**{¶ 63}** Having overruled appellant's two assignments of error, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.